UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-12-0278 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION TO DISQUALIFY** |
| JAMES MURRAY, | |
| Defendant. _____/ | |

Currently pending before the Court is the government's motion to disqualify Garrett Jason Zelen and his law office from representation of Defendant James Murray. The government seeks disqualification on the basis that Mr. Zelen has a conflict of interest. The Court held a hearing on the motion on March 6, 2013. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel and all other evidence of record, including that submitted in the related civil action brought the Securities Exchange Commission ("SEC"), *see SEC v. Murray*, C-12-1288 EMC (N.D. Cal.), the Court hereby **GRANTS** the motion to disqualify.

## I. FACTUAL & PROCEDURAL BACKGROUND

In the instant case, the government argues that there is a conflict of interest because "Mr. Zelen is implicated in a transaction that the government alleges was improper." Docket No. 99 (Pl.'s Memo at 3). The transaction centers on MNT Master Fund. MNT Master Fund is an entity that previously received allegedly tainted funds from MNT; MNT in turn was at the center of the

alleged scheme to defraud outside investors by Mr. Murray. MNT Master Fund received the funds from MNT through an account with Interactive Brokers.[1]

Subsequently, after the government seized the funds in MNT Master Fund's account with Interactive Brokers, *see SEC v. Murray*, C-12-1288 (Docket No. 42) (Kreuzkamp Decl., Ex. K) (seizure warrant, dated May 21, 2012), Mr. Murray used a different MNT Master Fund account to make a short sale (involving Netflix) which yielded a profit of $410,000. Instead of using the account with Interactive Brokers to make the sale, Mr. Murray used an account that MNT Master Fund held with Oppenheimer. Although the short sale required no money, the government argues that the $410,000 profit should still be considered the investors' money because MNT Master Fund is named on both accounts, including the Oppenheimer account, *see* Docket No. 99 (Pl.'s Memo at 7) (noting that the certificates of incorporation submitted for both accounts are the same), and, if the short sale had resulted in a loss and not a gain, then MNT Master Fund would have had to cover the loss. Docket No. 99 (Pl.'s Memo at 6). Notably, nothing in the documents associated with MNT Master Fund at Oppenheimer indicate that the account was in fact a personal account of Mr. Murray or any other individual, including the De Franciscis.

The government has also presented documents showing that, after the $410,000 profit was made, $150,000 of those allegedly tainted funds were sent to Mr. Zelen, who then allegedly "laundered" the funds by sending a substantial portion of the funds ($100,000) to Mr. Murray's father who then, in turn, sent a substantial part of the funds back to Mr. Murray ($15,000) and to Event Trading ($50,000), another entity with which Mr. Murray has a relationship.

Mr. Murray (through Mr. Zelen) argues that there is no conflict of interest because the $410,000 are not in fact tainted funds. According to Mr. Murray and Mr. Zelen, "[a]lthough the Oppenheimer account was opened in the *nominal* designation of MNT Master Fund, LTD, it was a different account with different beneficial owners and a different account number, at a different brokerage house, with no funds from the Investors to the original transaction." Docket No. 98 (Def.'s Memo at 5) (emphasis added). Although Mr. Murray never explains why the trade was

---

[1] Evidence supporting this earlier transaction was provided as a part of the SEC civil action. *See SEC v. Murray*, C-12-1288 EMC (N.D. Cal.).

made in the name of MNT Master Fund rather than his own individual account (or that of any other), Mr. Murray contends that the Court should hold an evidentiary hearing so that he may establish that the funds are in fact not tainted. He also suggests that, even if the Court were to find a conflict of interest, it would not be a sufficiently severe conflict such as to preclude a waiver of that conflict.

## II. DISCUSSION

The issue before the Court is twofold: (1) is there a conflict of interest in the case at bar and (2) if so, may that conflict be waived by Mr. Murray?

A. <u>Conflict of Interest</u>

As noted above, Mr. Murray argues that he should be given an evidentiary hearing so that he may establish that there is no conflict of interest -- *i.e.*, so that he may show that the allegedly tainted funds are not in fact tainted because they are completely separate and independent of the funds that were allegedly stolen from the investors. But for Mr. Zelen to even represent Mr. Murray in such an evidentiary hearing poses a serious conflict of interest. There are at least two major conflicts.

First, there is a conflict of interest because Mr. Zelen has a personal interest in a portion of the allegedly tainted funds. This kind of situation has been expressly recognized as a conflict of interest by the American Bar Association.[2] More specifically, ABA Model Rule of Professional Conduct 1.8(i) provides that "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client" with only limited exceptions which are not applicable here.[3] ABA Model Rule of Prof. Conduct 1.8(i). Courts have also recognized a conflict arising from such a circumstance based on, *e.g.*, governing state bar or other ethical rules. *See, e.g.*, *Fletcher v. Davis*, 33 Cal. 4th 61, 68 (2004) (noting that an attorney has acquired an interest adverse to his client "where it is reasonably foreseeable that his acquisition may become detrimental to the client, even though his intention is to aid the client"; adding that this

---

[2] The California State Bar has noted that "[t]he prohibition of certain conduct in [its] rules [of professional conduct] is not exclusive" and that "[e]thics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered." Cal. Rule of Prof. Conduct 1-100(A).

[3] Under the model, rule, a "lawyer may: (1) acquire a lien authorized by law to secure the lawyer's fee or expenses; and (2) contract with a client for a reasonable contingent fee in a civil case." ABA Model Rule of Prof. Conduct 1.8(i).

standard may be triggered "when counsel had 'acquired an interest in the subject matter of the litigation for which they had been retained'"); *In re Ski Train Fire in Kaprun Aus.*, No. 01 MDL # 1428 (SAS), 2007 U.S. Dist. LEXIS 60229, at *15 (S.D.N.Y. Aug. 16, 2007) (finding conflict of interest where attorney was in bankruptcy and told bankruptcy court that "the linchpin of his Chapter 11 plan is the attorney's fees he hopes to recover if and when a global settlement in reached in the . . . case [at bar]"; stating that "[t]he fact that [the attorney] is relying on this case to cover such substantial personal debts seriously undermines this Court's confidence in his ability to devise a prudent litigation strategy for his clients, to assess whether any proposed settlement offer is fair to his clients, or to otherwise conduct himself as a fiduciary of his clients' interests").

       In the instant case, Mr. Zelen has a personal stake in the allegedly tainted funds because, as noted above, $150,000 out of the allegedly tainted $410,000 was sent to Mr. Zelen. Mr. Zelen kept a portion of the $150,000 as payment for legal services. To the extent Mr. Murray might argue that there is no conflict because his interests and Mr. Zelen's interests are aligned -- *i.e.*, both want to establish that the $410,000 are not tainted -- the Court does not agree. While both share the interest of establishing no taint, the question is whether Mr. Zelen's self-interest might nevertheless compromise his representation of Mr. Murray. There is a genuine risk of such. For example, in order to prove that the money is not tainted, the testimony of Mr. Murray would be important: Mr. Murray was the individual responsible for transferring funds from MNT to MNT Master Fund; he was also the individual responsible for opening the MNT Master Fund's Oppenheimer account and then using it to conduct the Netflix short sale. But if Mr. Murray were to testify to clarify the circumstances, he would risk waiving his Fifth Amendment rights. The calculus of weighing the costs and benefits of waiving Mr. Murray's Fifth Amendment rights in the hearing on conflict of interest differs between Mr. Murray and Mr. Zelen; notably, Mr. Zelen not only has the $150,000 transfer at risk, but also compensation for his continued representation of Mr. Murray; and Mr. Zelen does not have the same personal stake in the underlying criminal case as does Mr. Murray.

       Second, there is a conflict of interest because, having received a portion of the allegedly tainted $410,000, Mr. Zelen has become at the very least a potential percipient witness. There are ethical rules which specifically identify this situation -- *i.e.*, attorney as advocate and witness -- as

4

problematic. For example, ABA Model Rule of Professional Conduct 3.7(a) provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." ABA Model Rule of Prof. Conduct 3.7(a). The Court acknowledges that, under California Rule of Professional Conduct 5-210, a client may consent to his lawyer serving as both an advocate and a witness. *See* Cal. Rule of Prof. Conduct 5-210(c) (providing that "[a] member shall not act as an advocate before a jury which will hear testimony from the member unless: . . . (C) [t]he member has the informed, written consent of the client"). However, the issue of consent or waiver is a separate issue from whether there is a conflict-of-interest problem in the first instance.

Mr. Zelen is a potential percipient witness because he may have knowledge as to the rightful ownership of the funds through his involvement with Mr. Murray and the documents reviewed in this case. To the extent Mr. Murray might argue that an evidentiary hearing need not reach what happened to the $410,000 *after* it was earned, the Court does not agree. What happened with the $410,000 after it was earned is probative of whether or not the funds were tainted in the first place. The government has submitted proof that, after receiving $150,000 out of the allegedly tainted funds, Mr. Zelen then transferred a portion of the funds to Mr. Murray's father who then sent back a portion of those funds to Mr. Murray. The multiple transfers supports the government's theory that Mr. Murray was "laundering" the funds and the only reason for Mr. Murray to launder the funds would be to protect the true source of the funds -- *i.e.*, it was money that actually belonged to the allegedly defrauded investors. Moreover, Mr. Zelen's role in the transaction leads to questions about whether he was involved in the alleged defrauding of the investors by *knowingly* participating in the laundering. For instance, at the hearing, Mr. Zelen said, if the Court were to permit an evidentiary hearing, he would explain why he sent $100,000 to Mr. Murray's father and show he was not laundering; he also represented that he did not know Mr. Murray's father then retransferred some of those funds to his son and to Event Trading. Mr. Zelen's credibility as to this testimony will be at issue. Thus, contrary to what Mr. Murray suggests, Mr. Zelen has become a witness in the

case, which puts him in the dubious position of being both an advocate and a witness. This creates a conflict of interest.

To the extent Mr. Murray argues that any conflict of interest is speculative, based not on evidence but rather simply a government proffer, that argument is without merit. The government has done more than make an offer of proof that the $410,000 in proceeds are tainted. In the SEC action and/or this criminal action, the government has provided documents -- the authenticity of which does not appear to be in dispute -- to support its claims. These documents indicate that, *e.g.*, MNT transferred suspected fraudulently obtained funds to MNT Master Fund; the same MNT Master Fund entity held the accounts at Interactive and Oppenheimer in its name, not Mr. Murray's name; and the $410,000 profit earned from the Netflix short sale was subject to multiple transfers as noted above. The Court acknowledges Mr. Murray's claims that the funds are not tainted because, *e.g.*, the Oppenheimer account was opened with $0 and any loss from the short sale was to be absorbed by Joseph De Francisci (the father of his colleague). But it is undisputed that the account was opened in the name of MNT Master Fund, not Mr. Murray or Mr. De Francisci. No account document containing Mr. De Francisci's name has been presented to the Court. The only evidence in this regard is an affidavit submitted by Mr. De Francisci; but it lacks clarity as to what he claims transpired between himself and Mr. Murray. For example, it is not clear whether Mr. De Francisci agreed to "settle" Mr. Murray's trades before or after the Netflix short sale. In fact, the syntax of the affidavit suggests Mr. De Francisci got involved "after" he saw Mr. Murray's Netflix trade. In any event, the government's showing is based on evidence not proffer.

In short, the Court concludes that Mr. Zelen's participation in this case -- even if just limited to representation of Mr. Murray in an evidentiary hearing to determine whether the $410,000 are tainted -- gives rise to two significant conflicts of interest.

B.  Waiver

Mr. Murray suggests that, even if there is a conflict of interest, he may waive that conflict in order to maintain representation by the counsel of his choice. There is no dispute that the governing legal authority on this is *Wheat v. United States*, 486 U.S. 153 (1988). In *Wheat*, the Supreme Court noted that, "while the right to select and be represented by one's preferred attorney is comprehended

6

by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* at 159. Thus, simply because a defendant waives a conflict of interest with respect to his preferred attorney, that does not mean that the waiver automatically prevails. Indeed, the Supreme Court emphasized that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160.

The Court went on to note that, "[w]here a [trial] court justifiably finds an *actual* conflict of interest, there can be no doubt that it may decline a proffer of waiver." *Id.* at 162 (emphasis added). But even where there is simply a potential conflict "which may or may not burgeon into an actual conflict as the trial progresses" a trial court is given "substantial latitude in refusing waivers of conflicts of interest." *Id.* at 163. Ultimately, a trial court "must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a *serious* potential for conflict." *Id.* at 164 (emphasis added).

Here, the Court finds that, at the very least, there is a serious potential for conflict, both because Mr. Zelen has a personal stake in the case and because he is a percipient witness. To the extent Mr. Murray argues that he is willing to waive the conflict, the Court finds the waiver insufficient because, as noted above, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession *and* that legal proceedings appear fair to all who observe them."[4] *Wheat*, 486 U.S. at 160 (emphasis added). Mr. Zelen's personal stake in the allegedly tainted funds all but amounts to an actual conflict, which the Court cannot condone. As for Mr. Zelen's dual role as advocate and witness, that would be particularly problematic given that the government is investigating his participation in the transaction at issue to determine whether he was a knowing participant in the alleged laundering. In this regard, the

---

[4] Accordingly, the fact that a client may consent to his lawyer serving as both an advocate and a witness under the California ethical rules is not dispositive.

Second Circuit's decision in *United States v. Jones*, 381 F.3d 114 (2d Cir. 2004), is especially instructive.

In *Jones*, the Second Circuit held that there was an *actual* conflict that trumped the defendant's waiver because the defendant's preferred attorney "and others at his law firm were likely to become the subjects of a grand jury investigation based on the possibility that they were passing information between the defendant [and another individual who was subject to a different criminal prosecution]." *Id.* at 120. The Second Circuit explained: "This criminal investigation of [the attorney] . . . would be a *per se* unwaivable conflict whether or not [the attorney] immediate withdrew from his representation of [the other individual] because of [the attorney's] self-interest in avoiding criminal charges." *Id.*

The *Jones* court then went on to note that, even without an actual conflict, there was still a serious potential conflict because "it was possible that [the attorney] would be a witness in the defendant's trial." *Id.* at 121. The Second Circuit acknowledged that, "[o]bviously, neither the court nor the parties were assured of the path the trial would [actually] take" but pointed out that this was why, per *Wheat*, a trial court has "'substantial latitude' in making the decision whether or not a conflict is waivable. If [the attorney] turns out to be an actual or unsworn witness in defendant's trial, this would be actual grounds for disqualification." *Id.* "The risk that [the attorney] would become a witness at trial was enough alone to allow the district court" to disqualify the attorney. *Id.*; *see also Simcho*, 2007 U.S. Dist. LEXIS 26870, at *4-8 (disqualifying defendant's preferred attorney because it was likely that the attorney would be mentioned as a key figure in the testimony of multiple witnesses -- to the effect that the attorney was being held out as an authority to induce the witnesses to do business with defendant; noting that attorney would essentially be functioning as an unsworn witness if not disqualified).

Because there is, at the very least, two serious potential conflicts, Mr. Zelen's willingness to waive is not dispositive and the Court concludes that disqualification is warranted.

///

///

///

### III. CONCLUSION

For the foregoing reasons, the Court grants the government's motion to disqualify. Mr. Zelen and his law firm are immediately disqualified from representation of Mr. Murray. The duty magistrate judge shall immediately set a hearing on identification of counsel.

This order disposes of Docket Nos. 98 and 99.

IT IS SO ORDERED.

Dated: March 11, 2013

_____
EDWARD M. CHEN
United States District Judge

9